UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                              :
In re:                                        :      Chapter 11
                                              :
OLD CARCO LLC, *et al.*,                      :      Case No. 09-50002 (SMB)
                                              :
                            Debtors.          :      (Jointly Administered)
--------------------------------------------------------------X
AUTUMN BURTON, *et al.*,                       :
                                              :
                            Plaintiffs,       :      Adv. Proc. No. 13-01109 (SMB)
                                              :
             − against −                      :
                                              :
CHRYSLER GROUP, LLC,                          :
                                              :
                            Defendant.        :
--------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING
IN PART MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**A P P E A R A N C E S :**

SCHNADER HARRISON SEGAL & LEWIS LLP
*Attorneys for Plaintiffs*
140 Broadway, Suite 3100
New York, NY 10005-1101

          Kenneth R. Puhala, Esq.
          Barry E. Bressler, Esq.
          Richard A. Barkasy, Esq.
          Eric A. Boden, Esq.
                    Of Counsel

SULLIVAN & CROMWELL LLP
*Attorneys for Defendants*
125 Broad Street
New York, New York 10004

          Steven L. Holley, Esq.
          Benjamin R. Walker, Esq.
                    Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The plaintiffs own vehicles that were manufactured and sold by the debtors, Old Carco

LLC and twenty four of its affiliates ("Old Carco" or the "Debtors"). They allege that their

vehicles suffer from a design flaw known as "fuel spit back." They commenced this class action

in Delaware state court against Chrysler Group LLC ("New Chrysler"), the purchaser of Old

Carco's assets, seeking relief for this design flaw under a variety of theories. Following removal

to Delaware District Court, New Chrysler moved to dismiss plaintiffs' Second Amended

Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing that the claims

are barred by the Sale Order entered in the Chrysler bankruptcy case. (*See Order (I) Authorizing*

*the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Interests*

*and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection Therewith and Related Procedures and (III)*

*Granting Related Relief*, dated June 1, 2009 ("*Sale Order*") (ECF Main Case[1] Doc. # 3232).)

The Delaware District Court transferred the dispute to this Court solely to determine the

effect of the Sale Order on the plaintiffs' claims. The Court concludes that with two exceptions

the Sale Order bars any claims based on a breach of a duty that existed as of the time of the June

10, 2009 closing. The exceptions relate to claims for the repair or replacement of parts under

warranties that accompanied the purchase of the vehicles when new or were acquired under

extended service contracts (collectively, the "Repair Warranty") and any "Lemon Law" claims

arising under non-bankruptcy law.[2] Conversely, the Sale Order obviously does not bar claims

---

[1]        "ECF Main Case" refers to the docket in the main bankruptcy case, 09-50002 (SMB), while "ECF" refers
to the docket in this adversary proceeding, 13-01109 (SMB).

[2]        A third exception, which deals with product liability claims arising from "accidents," is not relevant to the
plaintiffs' claims.

concerning vehicles manufactured or sold by New Chrysler after the closing or injuries resulting

from the breach of any duties that arose under non-bankruptcy law after the closing. The Court

leaves the determination of the legal sufficiency of those claims to the Delaware District Court.

## BACKGROUND

**A.    The Facts**

This lawsuit concerns the "fuel spit-back problem," a design flaw which causes fuel to

spill out of the filler tube during refueling. (*See Class Action Second Amended Complaint*, dated

Aug. 21, 2012 ("*SAC*"), at ¶ 2 (ECF Doc. # 1, Part 52).) Chrysler owners began to complain

about the problem in the fall of 2001, and as a result, Old Carco issued a safety defect recall in

2002, and a second safety recall for the 2005 MY Durango in 2005. (*SAC* ¶¶ 3-4.) In February

2007, owners of other model year Jeeps complained, and in January 2009, a further safety recall

was issued involving other Durango model vehicles. (*SAC* ¶¶ 5-6.)

After the bankruptcy sale described in the next section of this decision, New Chrysler

took steps to address the problem. In September 2009, it sent a Technical Service Bulletin

("TSB") to its dealers advising them that consumers were continuing to experience "fuel spit

back problems," and explaining various steps that might be required if a customer brought in his

or her Chrysler product with this complaint. (*SAC* ¶ 7.)

In August 2010, the National Highway Traffic Safety Administration ("NHTSA") opened

an investigation regarding complaints of "fuel spit-back problems" in 2007 and 2008 Jeep

Wranglers. (*SAC* ¶ 8.) The NHTSA advised New Chrysler that the same problem had been

found in 2005 and 2006 Jeep Wranglers. (*SAC* ¶ 8.) In response, New Chrysler admitted that (1)

the 2005 through 2010 Jeep Wrangler model vehicles included the same or similar fuel system

components, including the fuel tank assembly and inlet check valve, (*SAC* ¶ 9), (2) the 2005

through 2008 Durango model vehicles were appropriate peer vehicles with the same or similar

fuel tank assemblies and inlet check valves, (*SAC* ¶ 9), and (3) there were 542,650 Jeep

Wranglers and 266,315 Durangos with the same or similar fuel system assemblies and inlet

check valves.  (*SAC* ¶ 10.)

On February 11, 2011, New Chrysler issued Chrysler TSB No. 14-001-11 (the "February

2011 TSB").[3]  The latter extended a lifetime warranty to owners of 2007 and 2008 Jeep

Wranglers (approximately 135,000 vehicles).  (*SAC* ¶ 11.)  The February 2011 TSB provided

that if the customer experienced the "fuel spit back problem," the servicer should replace the fuel

tank and install a new fuel pump and Level Unit O-ring.  (*Plaintiffs' Opposition*, Ex. C.)   The

February 2011 TSB was not a safety recall, did not advise current owners of a flaw, safety defect

or hazard, and the customer had to complain about the problem in order to take advantage of the

extended warranty.  (*SAC* ¶ 11.)

In addition, New Chrysler issued Chrysler TSB No. 14-001-12, on January 20, 2012 (the

"January 2012 TSB"), which was slightly more detailed but essentially extended the same

lifetime warranty to the owners of 2006-2008 Durangos and 2007-2008 Aspens.[4]  That same

month, New Chrysler sent a letter to the owners of certain Dodge Durango vehicles advising

them that because of the "fuel spit back problems," their vehicles would now have a lifetime

---

[3]     The February 2011 TSB was not attached to the SAC, but a copy is attached as Exhibit C to *Plaintiffs'
Opposition to Chrysler Group LLC's Motion to Dismiss Second Amended Complaint*, dated Mar. 21, 2013
("*Plaintiffs' Opposition*") (ECF Doc. # 15).

[4]     The January 2012 TSB is attached to the *Plaintiffs' Opposition* as Exhibit E.

4

warranty for certain fuel system parts.  In the event a problem developed, a Chrysler dealership would repair their vehicle.  (*SAC* ¶ 15.)[5]

## B.    The Sale to New Chrysler

In the meantime, on April 30, 2009, the Debtors filed chapter 11 petitions in this Court. In a well-publicized transaction, they entered into a Master Transaction Agreement ("MTA") agreeing to sell substantially all of their assets free and clear of all claims and liabilities (other than "Assumed Liabilities"), whenever arising, to New Carco Acquisition LLC, later renamed Chrysler Group LLC ( *i.e.*, New Chrysler).  *See Shatzki v. Abrams*, No. 1:09cv02046 LJO DLB, 2010 WL 148183, at *1 (E.D. Cal. Jan. 12, 2010); *Cooper v. Daimler AG*, No. 1:-09-CV-2507-RWS, 2009 WL 4730306, at *1 (N.D. Ga. Dec. 3, 2009); *Ricks v. New Chrysler Group, LLC (In re Old Carco LLC)*, Adv. No. 12-09801 (SMB), 2013 WL 1856330, at *2 (Bankr. S.D.N.Y. May 2, 2013).  The transaction closed on June 10, 2009 (the "Closing Date"), the Debtors ceased operations and New Chrysler took over the operations of the "Chrysler" automotive business. *Ricks*, 2013 WL 1856330, at *2.

The MTA specified the liabilities that New Chrysler assumed.  (*See MTA* § 2.08 ("Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the Assumed Liabilities *and no others*." (Emphasis added).)[6]  The Assumed Liabilities included "all Liabilities pursuant to product warranties (including extended services contracts purchased from one of the Debtors), product returns and

---

[5]      The January 2012 letter was not attached to the SAC or supplied by the plaintiffs.  It may be the same letter as the January 25, 2012 letter referred to later in the SAC.  (*See SAC* ¶ 56.)  The January 25, 2012 was also not attached to the SAC.

[6]      A copy of the MTA is annexed as Exhibit A to the *Notice of (A) Successful Bidder for Substantially All of the Debtors' Assets and (B) Filing of Amended Purchaser Agreement*, dated May 31, 2009 (ECF Main Case Doc. # 3071).

rebates on vehicles sold by Sellers prior to the Closing." (*MTA* § 2.08(g), as modified by

*Amended No. 1 to Master Transaction Agreement*, dated May 31, 2009 ("*Amendment No. 1*"), at

¶ 14.)[7]  The MTA was subsequently amended to add section 2.08(h) which expanded the

category of Assumed Liabilities to include certain product liability claims arising from

"accidents." (*Amendment No. 4 to Master Transaction Agreement*, dated Oct. 29, 2009

("*Amendment No. 4*"), at ¶ 1.)[8]  Finally, paragraph 19 of the Sale Order approving the MTA

added certain Lemon Law claims to the list of Assumed Liabilities but limited the assumed

liabilities to vehicles manufactured within five years of the Closing Date.[9]

All other liabilities were expressly excluded.  "Excluded Liabilities" included "all

Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions

arising prior to or ongoing at the Closing," (*MTA* § 2.09(j)), and  "all Product Liability Claims

---

[7]        Amendment No. 1 is attached to the MTA.

[8]        Amendment No. 4 is annexed as Exhibit A to the *Stipulation and Agreed Order Approving Amendment No. 4 to Master Transaction Agreement*, dated Nov. 19, 2009 (ECF Main Case Doc. # 5988).)  The new § 2.08(h) expanded the Assumed Liabilities, *inter alia*, to include:

> (h) . . . (ii) all Product Liability Claims arising from the sale on or prior to the Closing of motor vehicles or component parts, in each case manufactured by Sellers or their Subsidiaries . . . solely to the extent such Product Liability Claims (A) arise directly from motor vehicle accidents occurring on or after Closing, (B) are not barred by any statute of limitations, (C) are not claims including or related to any alleged exposure to any asbestos-containing material or any other Hazardous Material and (D) do not include any claim for exemplary or punitive damages.

[9]        Paragraph 19 of the Sale Order provided, in relevant part, as follows:

> [T]he Purchaser, from and after the Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including reasonable attorneys' fees, if any, required to be paid under such Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws arising now, including but not limited to cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the Closing (without extending any statute of limitations provided under such Lemon Laws) . . . As used herein, "Lemon Law" means a federal or state statute, including, but not limited to, claims under the Magnuson-Moss Warranty Act based on or in conjunction with a state breach of warranty claim, requiring a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute.

arising from the sale of Products or Inventory on or prior to the Closing that are not described in

Section 2.08(h)."[10]  (*MTA* § 2.09(i); *Amendment No. 4* ¶ 2.)  "Product Liability Claim" meant

> any Action arising out of, or otherwise relating to in any way in respect of claims
> for personal injury, wrongful death or property damage resulting from exposure
> to, or any other *warranty claims*, refunds, rebates, property damage, product
> recalls, defective material claims, merchandise returns and/or any similar claims .
> . . .

(*MTA* (Definitions Addendum) at 90, as modified by *Amendment No. 1* ¶ 36) (emphasis added.)

The Sale Order reinforced that New Chrysler was buying Old Carco's assets free and clear of all

other claims.  Except as noted, "[t]he  transfer of the Purchased Assets to the Purchaser under the

Purchase Agreement will be a legal, valid and effective transfer of all of the legal, equitable and

beneficial right, title and interest in and to the Purchased Assets free and clear of all Claims that

are not Assumed Liabilities (including, specifically and without limitation, any products liability

claims, environmental liabilities, employee benefit plans and any successor liability claims),

except as otherwise provided in this Sale Order."  (*Sale Order* ¶ Z; *accord id.* ¶¶ 9**,** 12-17, 35, 38,

39, 42.)

     The net effect of these provisions, particularly those affecting warranty claims, was

explained by Bankruptcy Judge Arthur Gonzalez, the judge who oversaw the sale and signed the

Sale Order, in subsequent decisions.  For example, in *Tulacro v. Chrysler Group LLC (In re Old

Carco LLC)*, Adv. Proc. No. 11-09401 (AJG), slip op. (Bankr. S.D.N.Y. Oct. 28, 2011)

(ECF/Adv. Proc. No. 11-09401 Doc. # 18), the purchaser of a 2003 Dodge vehicle sued New

Chrysler alleging that it had failed to repair the vehicle.  In addition to claims under California's

Lemon Law, the plaintiff asserted general breach of warranty claims.

---

[10]     Prior to the amendment, section 2.08(h) provided that New Chrysler assumed "all Product Liability Claims
arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in
whole or in part prior to the Closing."

Judge Gonzalez parsed the language of the MTA, the amendments to the MTA and the Sale Order, and explained their relationship and meaning in the context of the negotiations in which they arose. He ruled that the only warranty-related obligations that New Chrysler assumed under MTA § 2.08(g) were the limited written warranties issued in connection with the vehicle pursuant to which the Debtors were obligated to "'cover the cost of all parts and labor needed to repair any defective item on [a] truck supplied by [the Debtors] that is defective in material, workmanship or factory preparation.'" *Tulacro*, at 6. These obligations corresponded to the Repair Warranty. New Chrysler did not assume any other warranty-related obligations except for (1) certain Lemon Law claims (under Sale Order ¶ 19) and (2) Product Liability Claims arising from accidents (under MTA § 2.08(h), as amended, (*see Amendment No. 4* ¶ 1)). *Tulacro*, at 6-7.

Judge Gonzalez reiterated his interpretation in his bench ruling granting New Chrysler's motion to dismiss the complaint in *Tatum v. Chrysler Group LLC (In re Old Carco LLC)*, Adv. Proc. No. 11-09411 (AJG), slip op. (Bankr. S.D.N.Y. Feb. 15, 2012) (ECF/Adv. Proc. No. 11-09411 Doc. # 73). He explained that as originally drafted, the MTA excluded all claims relating to vehicles sold prior to the Closing Date. Certain amendments carved out narrow exceptions. New Chrysler assumed written warranties, limited to the costs of parts and labor, and did not assume any other warranty-related claims. If the repair was not effective, no further liability was assumed.[11] Otherwise, MTA § 2.09(i), as amended (*see Amendment No. 4*, at ¶ 2), barred all warranty claims.

---

[11]    As discussed later in the text, the inability to repair a defect might nonetheless give rise to a Lemon Law claim.

His conclusion is bolstered by the language added to MTA § 2.08(g) through Amendment No. 1.  Under section 2.08(g), as originally written, New Chrysler assumed liability for "product warranties, product returns and rebates" on vehicles sold before the closing.  Amendment No. 1 inserted the parenthetical phrase "including extended services contracts purchased from one of the Debtors" following the phrase "product warranties."  An "extended service contract" is an additional warranty "to cover repair costs not otherwise covered by a manufacturer's standard warranty, by extending either the standard-warranty coverage period or the range of defects covered."  BLACK'S LAW DICTIONARY 1725 (9th ed. 2009).  Its placement suggests that it is a species of "product warranties," and "product warranties," like the "extended service contracts," a limited to the repair and replacement of defective parts.

## C.    This Action

On November 29, 2011, five of the current plaintiffs (Autumn Burton, Matthew Cox, Dan Gulick, Rodney Lafleur, and James Spitler) filed a class action complaint in the Superior Court of the State of Delaware against New Chrysler.  (*See Class Action Complaint*, dated Nov. 29, 2011 ("*Complaint*") (ECF Doc. # 1, Part 2).)  Each plaintiff had apparently purchased and owned a used 2005 or 2006 Dodge Durango or Jeep Wrangler manufactured by Old Carco.[12] (*Complaint* ¶¶ 18-22.)  The plaintiffs alleged that the 2005-2010 Jeep Wranglers and 2005-2008 Dodge Durangos suffered from the "fuel spit back" design flaw and the attendant safety defects and hazards.  (*Id.* ¶ 9.)  New Chrysler removed the action to the District Court of Delaware on January 3, 2012, and immediately moved to dismiss the complaint.  (*Chrysler Group LLC's Brief in Support of its Motion to Dismiss*, dated Jan. 10, 2012 (ECF Doc. # 1, Part 9).)

---

[12]    Each of the plaintiffs had purchased a prior model year, suggesting that the vehicles were bought used.

The plaintiffs eventually filed the SAC, and joined Mike Burke, Eric Malloy, Mike Gasman and Ryan Gillette as additional plaintiffs.  The nine plaintiffs own the following vehicles:

| Plaintiff | Vehicle Owned |
|---|---|
| Autumn Burton | 2006 Dodge Durango |
| Matthew Cox | 2005 Jeep Wrangler |
| Dan Gulick | 2005 Jeep Wrangler |
| Rodney LaFleur | 2005 Jeep Wrangler |
| James Spitler | 2006 Jeep Wrangler |
| Mike Burke | 2007 Jeep Wrangler |
| Eric Malloy | 2005 Dodge Durango |
| Mike Gasman | 2005 Jeep Wrangler |
| Ryan Gillette | 2005 Jeep Wrangler |

The gravamen of the SAC centers on the failure to warn the vehicle owners of the "fuel spit back" design flaw and related safety issues, or correct the problem.  The SAC includes the

following eight counts:

| Count | Relevant Vehicles | Nature of Claim |
|---|---|---|
| I | 2009-2010 Jeep Wranglers | Negligence regarding duties assumed under the February 2011 TSB, in failing to include Jeep Wranglers with the "fuel spit back" defect sold after the Closing Date, rectify the defect or provide adequate notice of the defect and its hazards. (*SAC* ¶¶ 44-50.) |
| II | 2007-2008 Jeep Wranglers | Negligence regarding duties assumed under the February 2011 TSB, in failing to rectify the "fuel spit back" defect, provide adequate notice to the owners regarding the defect and advise them that repairs should promptly take place. (*Id.* ¶¶ 51-54.) |
| III | 2006-2008 Dodge Durangos | The January 2012 TSB and a January 25, 2012 letter, which advised the owners that they might have to replace a portion of their vehicle's fuel system because of the "fuel spit back" problem and granted a life-time warranty to obtain certain parts regarding this defect, failed to provide appropriate and necessary measures to correct the defect. (*Id.* ¶¶ 55-58.) |
| IV | 2007-2008 Jeep Wranglers | The February 2011 TSB failed to reasonably notify all owners or provide an effective remedy to correct the design flaw. (*Id.* ¶¶ 59-63.) |
| V | 2005-2010 Jeep Wranglers and 2005-2008 Dodge Durangos | New Chrysler failed to extend the warranties covered by the February 2011 TSB and January 2012 TSB to all of the vehicles that suffered from the same design flaw, and generally failed to warn of the hazards of the "fuel spit back" problem, repair the vehicles, notify the owners of the need for repairs, and carry out appropriate remedial measures to eliminate the hazards and safety issues and loss of fuel from "fuel spit back" in these vehicles. (*Id.* ¶¶ 64-71.) |
| VI | 2005-2009 Jeep Wranglers and 2005-2008 Dodge Durangos | The sale of the vehicles with the "fuel spit back" design defect constituted breaches of the implied warranties of merchantability and fitness for a particular purpose, which were assumed by New Chrysler. (*Id.* ¶¶ 72-87.) |
| VII | 2009-2010 Jeep Wranglers | The sale of the vehicles with the "fuel spit back" design defect constituted breaches of the implied warranties of merchantability and fitness for a particular purpose. (*Id.* ¶¶ 88-102.) |
| VIII | 2007-2008 Jeep Wranglers and 2006-2008 Dodge Durangos | The sale of the vehicles with the "fuel spit back" design defect constituted breaches of the implied warranties of merchantability and fitness for a particular purpose. (*Id.* ¶¶ 103-116.) |

After hearing New Chrysler's motion to dismiss, the Delaware District Court transferred the civil action by order dated August 28, 2012 to the United States District Court for the Southern District of New York for referral to this Court.  (*Order to Transfer*, dated Aug. 28, 2012, attached as Exhibit B to *Plaintiffs' Opposition*.)  The transfer order stated that "[i]f the bankruptcy court determines that any of the claims asserted in Plaintiffs' Second Amended Complaint are not barred by the Sale Order, Chrysler Group LLC shall abide by its representations made in this Court and stipulate that any remaining claims be remanded back to this Court for further proceedings."  (*Id.* ¶ 3.)

### D.    This Motion

New Chrysler filed a motion in this Court to dismiss the SAC on February 28, 2013.  (*See Chrysler Group LLC's Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint*, dated Feb. 28, 2013 (ECF Doc. # 7).)  It contends that all of the plaintiffs' claims are barred by the Sale Order.  In addition, it argues that none of the plaintiffs purchased a vehicle that was manufactured after the closing, and they cannot, therefore, assert the rights of post-closing purchasers.

Although the SAC alleges several breaches of duty that arose prior to the Closing Date, the plaintiffs primarily contend that the SAC alleges the breach of duties that arose under or relate to the TSBs issued after the closing and do not implicate the Sale Order.  (*See Plaintiffs' Opposition* ¶¶ 32-33, 38-40.)  Relying on *Morgan Olson, LLC v. Frederico (In re Grumman Olson Indus., Inc.)*, 445 B.R. 243 (Bankr. S.D.N.Y. 2011), *aff'd*, 467 B.R. 694 (S.D.N.Y. 2012), the plaintiffs also maintain that the Sale Order could not cut off their claims if they were not injured until after the closing.  (*Plaintiffs' Opposition* ¶¶ 41, 65-66.)  In addition, they argue that New Chrysler assumed Old Carco's warranty obligations under the Sale Order, (*id.* ¶¶ 43-44),

12

and through statements made by Old Carco and New Chrysler before, during and after the sale

that the warranties would be honored.  (*Id.* ¶¶ 45-50.)  Finally, the plaintiffs contend that they

have asserted valid Lemon Law claims, (*id.* ¶¶ 56-58), but if they have not, they request

permission to amend the SAC to assert Lemon Law claims.  (*Id.* ¶¶ 59-60.)

New Chrysler filed a reply reaffirming its position, maintaining that the 2011 and 2012

TSBs did not create the duties that form the bases of their claims and denying *Grumman*'s

applicability.  (*See Chrysler Group LLC's Reply Memorandum in Support of its Motion to

Dismiss the Second Amended Complaint*, dated Mar. 28, 2013 ("*Chrysler Reply*") (ECF Doc.

#16).)

## DISCUSSION

### A.    Standard for a Motion to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citations omitted); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  *Iqbal* outlined a two-step approach in deciding a motion to dismiss.  The court begins by

"identifying pleadings that, because they are no more than [legal] conclusions, are not entitled to

the assumption of truth."  *Iqbal*, 556 U.S. at 679.  "Threadbare recitals of the elements of a cause

of action supported by conclusory statements" are not factual.  *See id.* at 678.  Next it gives all

"well-pleaded factual allegations" an assumption of veracity to determine whether, together, they

plausibly give rise to an entitlement of relief.  *Id.* at 679.

In deciding the motion, "courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in

particular, documents incorporated into the complaint by reference, and matters of which a court

may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

(2007).  The court may also consider documents that the plaintiff relied on in bringing suit and

that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *Brass v. Am. Film Techs.,

Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-

48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *McKevitt v. Mueller*, 689 F. Supp. 2d 661,

665 (S.D.N.Y. 2010).  Where the complaint cites or quotes from excerpts of a document, the

court may consider other parts of the same document submitted by the parties on a motion to

dismiss.  *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1532 n. 23 (S.D.N.Y. 1995).

The Court has considered several documents outside the pleadings in judging the legal

sufficiency of the SAC.  These include the contents of numerous documents docketed with the

Court relating to the sale (the MTA, Amendment No. 4, the Sale Order). They are subject to

judicial notice, and the transfer order requires that I consider their provisions. [13]   In addition, the

plaintiffs relied on and referred to the February 2011 TSB and the January 2012 TSB in the SAC.

**B.    *Grumman*, Successor Liability and Due Process**

As a threshold matter, the plaintiffs argue that under *Grumman Olson,* a Bankruptcy

Code § 363 sale order cannot cut off successor liability for injuries suffered after the closing.  In

*Grumman Olson*, the debtor manufactured and sold truck bodies to motor vehicle manufacturers

who, in turn, incorporated the truck bodies into a complete vehicle, which they sold to the public.

---

[13]    In addition, the SAC alleges that "the class members do not include those who own vehicles sold before the
Bankruptcy Sale Order date that are not subject to the assumption of warranty liabilities set forth in Paragraph 19 of
the Sale Order."  (*SAC* ¶ 40.)  The plaintiffs incorporated this allegation into every Count other than Count II.

Prior to bankruptcy, the debtor allegedly sold a truck body that was incorporated into a vehicle sold to FedEx.  The debtor thereafter filed for bankruptcy in this Court and sold its assets free and clear of liens, claims, interests and encumbrances.  The sale order also included a provision that exonerated the buyer from claims against the debtor based on successor liability.

Years later, the plaintiff, a FedEx employee, was seriously injured when the FedEx truck she was driving hit a telephone pole.  She and her husband sued the debtor's buyer under New Jersey's successor liability laws, contending that the buyer was liable for the debtor's defective design and manufacture of the truck body involved in the accident.  The buyer brought an adversary proceeding in this Court seeking a declaration that the sale order was a complete defense to the successor liability claim.  The sole issue was whether the sale order provided a complete defense to the plaintiffs' claims.

The Court granted the plaintiffs' motion for summary judgment and dismissed the complaint concluding that the sale order was no bar.  The plaintiffs had no prior contact with the debtor, and did not have a claim against the debtor at the time of the sale, years before the accident had occurred.  *Grumman Olson*, 445 B.R. at 253.  In addition, permitting the buyer to rely on the sale order as a defense would result in a denial of due process.  The plaintiffs did not receive meaningful notice of the bankruptcy proceedings because prior to the accident, they would have had no basis to pay any attention to the bankruptcy case or do anything about it.  *Id.* at 254.

Here, the plaintiffs' invocation of *Grumman Olson* is correct in one sense.  New Chrysler, like the defendant in *Grumman Olson*, is an entirely different entity from the debtor. *Wolff v. Chrysler Group LLC* (*Old Carco LLC*), Adv. Proc. No. 10-05007, slip op. at 11 (Bankr.

15

S.D.N.Y. July 30, 2010) (ECF/Adv. Proc. No. 10-5007 Doc. # 43) ("New Chrysler is not a related debtor, nor is it responsible for all of Old Carco's obligations. Old Carco and New Chrysler are distinct entities against which different claims may be asserted.") Otherwise, *Grumman Olson* is distinguishable. The plaintiffs or their predecessors (the previous owners of the vehicles) had a pre-petition relationship with Old Carco, and the design flaws that they now point to existed pre-petition. At a minimum, they held contingent claims because "the occurrence of the contingency or future event that would trigger liability was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created.'" *Id.* at 252 (quoting *United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004 (2d Cir. 1991) (quoting *In re All Media Props., Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd mem.*, 646 F.2d 193 (5th Cir. 1981)). Anyone who owns a car contemplates that it will need to be repaired, particularly when, as here, Old Carco had already issued at least two and possibly three recall notices for the "fuel spit back" problem for certain Durango and other Old Carco vehicles before the original purchasers bought their vehicles from Old Carco.

## C.    Breach of Implied Warranties (Counts VI, VII and VIII)

As noted, the Assumed Liabilities under the MTA included "product warranties," including extended service contracts, but expressly excluded "Product Liability" claims (other than claims arising from accidents), defined, *inter alia*, to include claims for "damage resulting from exposure to, or any other warranty claims, refunds, rebates, property damage, product recalls, defective material claims . . . ." (*MTA* (Definitions Addendum) at 90, as modified by *Amendment No. 1*, at ¶ 36.) Construing the relevant provisions of the MTA, as amended, and the Sale Order, Judge Gonzalez ruled that the product warranty claims were limited to the costs of

the parts and labor associated with the repair, *i.e.*, the Repair Warranty.  *Tulacro*, at 6; *accord*

*Ricks*, 2013 WL 1856330, at *3.  No further liability was assumed if the repair was ineffective.

*Ricks*, 2013 WL 1856330, at *4.

Counts VI, VII and VIII purport to assert claims based on breach of the implied

warranties of merchantability and fitness for a particular purpose on behalf of owners of vehicles

manufactured and/or sold before and after the closing.  Under the Sale Order, the owners of the

vehicles that were manufactured and sold prior to the closing are limited to the Repair Warranty

and are not entitled to damages or any other remedy beyond that unless the breach of warranty

forms the basis for a Lemon Law claim discussed below.

The plaintiffs nonetheless argue that New Chrysler assumed these pre-existing implied

warranties based on certain public statements pointing to the following:

1.      After the bankruptcy filing but prior to the sale, Old Carco CFO Ronald E.
Kolka stated that preserving Old Carco warranty obligations was essential to
maintaining customer loyalty and to ensuring the least amount of detriment to the
debtors' estate.  (*Plaintiffs' Opposition* ¶ 45).

2.      When Old Carco announced the sale, its Chairman and CEO, Bob
Nardelli, wrote an open letter to the public stating that "[t]he company will
seamlessly honor all warranty claims."  (*Id.* ¶ 46.)

3.      The motion to approve the sale stated that New Chrysler would be
assuming "[l]iabilities for product warranties, product returns and rebates on
vehicles sold pre-closing," and "[w]arranty obligations and product recall
liabilities related to vehicles sold pre-closing."  (*Id.* ¶ 47.)

4.      During the sale hearing, Kolka testified that New Chrysler "plans on
paying the warranty claims."  (*Id.* ¶ 48.)

5.      After the sale closed, New Chrysler stated in a letter to Senator Richard
Durbin on August 27, 2009 that "the company will accept product liability claims
on vehicles manufactured by Old Carco before June 10 that are involved in
accidents on or after that date.  This is in addition to our previous commitment to
honor warranty claims, lemon law claims, and safety recalls regarding these
vehicles."  (*Id.* ¶ 49 (quoting *Plaintiffs' Opposition*, Ex. H).)

6.      Ronald Bloom of President Obama's Task Force on the Automotive
Industry stated that New Chrysler "decided to honor the warranty claims of prior
owners of their cars because on a commercial basis, the last buyer of a GM or
Chrysler is the most likely candidate to be the next buyer." (*Id.* ¶ 50 (quoting
*Plaintiffs' Opposition*, Ex. I).)

Initially, the SAC did not rely on or quote these statements, and did not allege that New

Chrysler had assumed implied warranties by virtue of these statements. Hence, they should not

be considered in judging the legal sufficiency of the SAC. In addition, the SAC does not allege

that Kolka worked for or had authority to speak on New Chrysler's behalf, and New Chrysler

denies that he did. (*See Chrysler Reply* at 5.) The quoted statement attributed to Nardelli does

not appear in the exhibit that supposedly contained it, (*see Plaintiffs' Opposition*, Ex. F), and

moreover, Nardelli made the statement as an employee of Old Carco, not New Chrysler.

Similarly, the SAC does not allege facts indicating that Bloom, a member of the President's Task

Force, had authority to speak for New Chrysler.

In any event, all of the statements are consistent with New Chrysler's position and this

Court's interpretation of the Sale Order. New Chrysler did agree to honor warranty claims—the

Repair Warranty. None of the statements attributed to New Chrysler state or imply that it

assumed liability to pay consequential or other damages based upon pre-existing defects in

vehicles manufactured and sold by Old Carco.

The claims asserted on behalf of the post-closing purchasers raise different issues. New

Chrysler argues that the plaintiffs lack standing to assert these claims because none of the

plaintiffs own a vehicle that was manufactured or sold post-closing by New Chrysler. In

addition, none of the plaintiffs own a model year 2008 or 2009 vehicle, or a 2007 Dodge

Durango. The plaintiffs counter that in a class action involving the same motor vehicle, the

named plaintiffs can represent the owners of other vehicles with the same problem. (*See Plaintiffs' Opposition* ¶ 62 n. 2.)

I do not decide the standing question because it appears to be intertwined with the class certification issues that will be decided by the Delaware District Court. Nor do I decide whether the post-closing purchasers have alleged legally sufficient breach of warranty claims under non-bankruptcy law. It is enough to say that the Sale Order does not affect any claims held by owners who purchased cars manufactured or sold by New Chrysler after the closing.

**D.     Other Claims**

**1.     Counts I and V**

Counts I and V assert claims on behalf of pre-closing and post-closing customers who own vehicles that suffer from the "fuel spit back" problem but were not covered by the February 2011 TSB and January 2012 TSB. The plaintiffs allege that New Chrysler negligently and wrongfully failed to include these vehicles in the TSBs, warn the owners of the defect or correct the defect.

It bears repeating that New Chrysler did not assume any liabilities with respect to any pre-existing defects except for the Repair Warranty, Lemon Law claims and Product Liability claims involving accidents. New Chrysler had no duty to extend lifetime warranties to any owner of an Old Carco vehicle. Its duty to repair and replace the "fuel spit back" flawed components as to those owners who did not receive the benefit of a lifetime warranty is limited to the Repair Warranty, or possibly, the applicable Lemon Law.

The "duty to warn" raises a more difficult question. New Chrysler did not assume Old Carco's duty to warn its customers about the "fuel spit back" problem, and any claim based on

the breach of Old Carco's duty to warn is barred by the Sale Order. Nevertheless, the law may impose a separate duty to warn on New Chrysler. Here, New Chrysler purchased Old Carco's assets. Succession alone does not impose a duty to warn a predecessor's customers of pre-existing defects, *Florom v. Elliott Mfg.*, 867 F.2d 570, 577 (10th Cir. 1989); *Travis v. Harris Corp.*, 565 F.2d 443, 448-49 (7th Cir. 1977), but the duty may arise where the successor (1) succeeds to the predecessor's service contracts that cover the particular machine, (2) actually services the machine, (3) is aware of the defect and (4) knows the location of the machine's owner. *Florom*, 867 F.2d at 577; *Polius v. Clark Equip. Co.*, 802 F.2d 75, 84 (3d Cir. 1986); *Travis*, 565 F.2d at 449; *Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 199 (N.Y. 1983); RESTATEMENT (THIRD) OF TORTS § 13 cmt. b (1998). In these circumstances, the law imposes a duty to warn because the successor has entered into a relationship with the customer and derives an actual or potential economic benefit. *Schumacher*, 451 N.E.2d at 199.

Here, the Sale Order bars the claim that New Chrysler breached a duty to warn Old Carco customers that their vehicles had a design flaw, to wit, the "fuel spit back problem." The duty to warn cases typically involve a plaintiff who suffers a personal injury because someone failed to warn him about a dangerous product, and the failure to warn *proximately caused* his *subsequent* injury. The plaintiffs in this case do not allege subsequent personal injuries. For example, they do not allege that fuel splashed back in their eyes as a result of the defect while refueling their vehicles. Instead, they seek monetary and injunctive relief based on a pre-Closing Date design flaw. (*SAC* ¶¶ 1, 38.) Each purchased a defective vehicle manufactured by Old Carco that requires more servicing and is worth less money. New Chrysler's failure to warn them that they purchased a defective vehicle manufactured by Old Carco did not *proximately cause* their economic injury, and each plaintiff's failure to warn claim "is a typical successor liability case

dressed up to look like something else, and is prohibited by the plain language of the bankruptcy court's Order." *Otoski v. Avidyne Corp.*, No. CV. 09-3041-PK, 2010 WL 4739943, at *7 (D.Or. Oct. 6, 2010) (report and recommendation), *adopted*, 2010 WL 4737815 (D.Or. Nov. 15, 2010).[14]

The claims asserted on behalf of the post-closing purchasers are not affected by the Sale Order. I do not consider whether the SAC alleges legally sufficient claims as to these purchasers.

### 2.    Counts II, III and IV

Counts II, III and IV assert similar claims (failure to warn, failure to correct) based on the February 2011 and January 2012 TSBs.[15] The vehicles covered by these counts were manufactured and sold to the original buyer prior to the Closing Date. For the reasons stated, the Sale Order would cut off these claims beyond those under the Repair Warranty and the Lemon Laws unless New Chrysler voluntarily assumed post-closing obligations under the TSBs. The Sale Order, in this regard, did not prevent New Chrysler from voluntarily assuming obligations that it did not have, such as extending a lifetime warranty to repair or replace a defective fuel assembly. I do not opine on the scope of the duties that New Chrysler assumed when it issued the TSBs or the legal sufficiency of these claims under non-bankruptcy law except to note that they would not be barred by the Sale Order.

---

[14]    In addition, the SAC does not allege that New Chrysler serviced the plaintiffs' vehicles or that New Chrysler is aware of each plaintiff's location. As noted, the original plaintiffs apparently purchased used vehicles, and New Chrysler may not even have a record of their ownership.

[15]    Count IV appears to duplicate Count II.

E.      **Leave to Appeal**

Lastly, the plaintiffs seek leave to amend the SAC to assert claims under applicable Lemon Laws.  Most if not all states have Lemon Laws that provide remedies to consumers who purchase chronically defective vehicles that cannot be repaired after several attempts.  *See Ricks*, 2013 WL 1856330, at *4 (discussing the Minnesota Lemon Law).  New Chrysler assumed Lemon Law claims under paragraph 19 of the Sale Order provided that the vehicle was manufactured within five years of the Closing Date, or after June 10, 2004.  The plaintiffs' vehicles appear to satisfy the latter requirement, and hence, the Sale Order would not bar their Lemon Law claims.

Whether they can assert legally cognizable Lemon Law claims is a different question. The answer depends on the law that governs each plaintiff's claim and whether the plaintiff can plead facts that satisfy the requirements of the particular Lemon Law.  I reject the plaintiffs' contention that they have pleaded adequate Lemon Law claims in light of a settlement stipulation between New Chrysler and other plaintiffs in another litigation involving a different vehicle with different defects.  (*Plaintiffs' Opposition* ¶¶ 56-58.)  The sufficiency of the claim and the available remedies depend on the law that governs the claim.  With some variation, the party asserting a Lemon Law claim must typically plead and ultimately prove that (1) the vehicle does not conform to a warranty, (2), the nonconformity substantially impairs the use or value of the vehicle, and (3) the nonconformity continues to exist after a reasonable number of repair attempts.  *E.g.*, *Sipe v. Fleetwood Motor Homes of Penn., Inc.*, 574 F. Supp. 2d 1019, 1028 (D. Minn. 2008) (applying Minnesota law), *aff'd*, *Sipe v. Workhorse Custom Chassis, LLC*, 572 F.3d 525 (8th Cir. 2009); *McLaughlin v. Chrysler Corp.*, 262 F. Supp. 2d 671, 679 (N.D.W. Va.) (applying West Virginia law), *aff'd*, 47 F.App'x. 659 (4th Cir. 2002); *Baker v. Chrysler Corp.*,

22

Civ. A. No. 91-7092, 1993 WL 18099, at *1-2 (E.D. Pa. Jan. 25, 1993) (applying Pennsylvania

law), *aff'd*, 9 F.3d 1539 (3d Cir. 1993); *Palmer v. Fleetwood Enterp., Inc.*, Nos. C040161,

C040765, 2003 WL 21228864, at *4 (Cal. Ct. App. May 28, 2003) (applying California law);

*Iams v. Daimler Chrysler Corp.*, 883 N.E. 466, 470 (Ohio Ct. App. 2007) (applying Ohio law);

*DiVigenze v. Chrysler Corp.*, 785 A.2d 37, 48 (N.J. Super. Ct. App. Div. 2001), *certification

denied*, 794 A.2d 181 (2002) (applying New Jersey law).  The SAC does not plead that any of

the plaintiffs brought their vehicles in for servicing, or that New Chrysler was unable to fix the

problem after a reasonable number of attempts.  I do not rule on their request to file an amended

pleading and leave it to the Delaware District Court which will handle this matter.

## CONCLUSION

In conclusion, the plaintiffs have not asserted any assumed products liability claims, and

the Sale Order bars all other pre-closing claims except Repair Warranty claims and Lemon Law

claims relating to vehicles manufactured within five years of the Closing Date.  Accordingly, the

breach of implied warranty claims asserted in Counts VI, VII and VIII with respect to vehicles

manufactured and sold before the closing are dismissed, as are the claims asserted on behalf of

the same owners in Counts I and V that New Chrysler failed to extend the TSBs to these owners

or breached a duty to warn.  With respect to all other claims, any repair claims are not dismissed

to the extent that they are based on the Repair Warranty.  Finally, the Sale Order does not affect

any claims based on the manufacture or sale of vehicles by New Chrysler *after* the closing or

based on a duty that New Chrysler assumed *after* the closing under the TSBs or otherwise.  The

Court has considered the remaining arguments made by the parties and concludes that they lack

merit.

The parties are directed to arrange for a status conference to discuss whether any further

proceedings in this Court are necessary or appropriate under the transfer order.

So ordered.

Dated: New York, New York
June 26, 2013

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge